# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| | : | |
| G.L. by and through his parents, S.H. and K.L.; | : | CIVIL ACTION |
| and S.H. and K.L., | : | |
| Plaintiffs, | : | NO. 15-6425 |
| v. | : | |
| | : | |
| SAUCON VALLEY SCHOOL DISTRICT, | : | |
| Defendant. | : | |

_____

### MEMORANDUM

Henry S. Perkin, M.J.                                    March 30, 2017

       Plaintiffs S.H. and K.L. bring this action pursuant to the Individuals with

Disabilities Education Act ("IDEA")[1] on behalf of G.L., their son. 20 U.S.C. § 1415(I).[2]  S.H.

and K.L. challenge the September 20, 2015 decision of Hearing Officer William F. Culleton, Jr.,

Esquire, that the Saucon Valley School District did not fail to provide G.L. with a free and

appropriate public education ("FAPE") from April 13, 2013 through September 15, 2015, that

the District provided an appropriate placement for G.L. during the subject period of time and that

no compensatory education or prospective relief was warranted.  (A.R., Ex. 2.)[3] This matter is

brought before the Court on the cross-motions for judgment on the administrative record which

was before the Hearing Officer.   In the Amended Complaint, Plaintiffs ask this Court to:  hear

---

[1]    The IDEA defines "children with disabilities" as children needing special education because of "mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities."  20 U.S.C. § 1401(3)(A).

[2]    20 U.S.C. § 1415(i)(2) provides that the findings of a special education due process hearing may be appealed to any state court of competent jurisdiction or in a federal district court without regard to the amount in controversy.

[3]    References to the Administrative Record are indicated by the abbreviation "A.R."

additional evidence on the appropriateness of G.L.'s IEP and whether the District provided him with a free and appropriate public education from the end of the 2012-2013 school year through the present time; reverse the decision of the Hearing Officer and order all relief that is appropriate under the IDEA, including but not limited to compensatory education and prospective placement; Order the District to pay Plaintiffs their attorneys' fee and costs incurred in litigating this action pursuant to 20 U .S.C. Sections 1415(i)(3)(B); and grant any other relief as the Court deems just and proper.  See Am. Compl., p. 7.

This Court has subject matter jurisdiction over this matter pursuant to 20 U.S.C. Section 1415 (i)(2) and (3), as an appeal of an administrative hearing under the IDEA and pursuant to 28 U.S.C. Section 1331. Venue is proper pursuant to 28 U.S.C. Section 1391(b) in that the district is located in the Eastern District of Pennsylvania and because a substantial part of the events and/or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.[4] The court has received the administrative record and despite Plaintiffs' request for relief in the Amended Complaint which included asking this Court to hear additional evidence on the appropriateness of G.L.'s IEP and whether the District provided him with a free and appropriate public education from the end of the 2012-2013 school year through the present time, during the Rule 16 Scheduling Conference held telephonically on June 9, 2016 and in the Motions, the parties have not proposed taking any additional evidence or additional evidence for this Court's consideration.  Disposition by motion for judgment on the administrative record is proper.  See

---

[4]         This case was originally assigned to the docket of the Honorable Lawrence F. Stengel. On April 1, 2016, the parties filed a *Consent to Jurisdiction by a U.S. Magistrate Judge*.  (Dkt. No. 9.)  On April 6, 2016, Judge Stengel approved the consent and Ordered the referral of this case in accordance with 28 U.S.C. §636(c) and Fed. R. Civ. P. 73. (Dkt.No. 10.)

L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3rd Cir. 2006); Brett S. v. The West Chester Area Sch. Dist., Civ. A. 04-5598, 2006 WL 680936 (E.D. Pa. March 13, 2006); Marissa F. v. The William Penn Sch. Dist., Civ. A. 04-0286, 2005 WL 2304738 (E.D. Pa. Sept. 20, 2005), aff'd 199 Fed. Appx. 151 (3rd Cir. 2006).  There is no question about disputes of fact so much as application of the facts by the Hearing Officer.  For the reasons that follow, the Defendant's Motion will be granted and the Plaintiffs' Motion will be denied.

## I.     HISTORY OF THE CASE.

At the time of the filing of the Complaint in this Court on December 3, 2015, G.L. was an eleven year-old student identified as a student with a disability in need of specially designed instruction under the disability category of Emotional Disturbance. G.L. recently turned thirteen and is currently in the seventh grade.  G.L. resides with his mother, maternal grandparents and three siblings within the Saucon Valley School District ("the District") in Northampton County, Pennsylvania.  G.L. received special education and related services from the District.  He brings this action by and through his mother, S.H., who has primary physical custody of G.L. and has the right to make educational decisions for him, and his father, K.L.

S.H. requested an administrative due process hearing seeking an appropriate placement for G.L., alleging that he was denied a free and appropriate public education beginning in April of 2013, including the 2013-2014 and 2014-2015 school years and continuing to the present.  The District is a school district in Northampton County, Pennsylvania and is a local educational agency ("LEA") within the meaning of the IDEA. As such, it receives federal funds for the purpose of educating children with disabilities within its boundaries.

G.L. was identified in February of 2010 as a student with a Speech and Language

Impairment and is entitled to special education under the IDEA.  20 U.S.C. §§ 1400, et seq.

Until the Spring of 2013, G.L. received only speech and language services through an

Individualized Education Plan ("IEP") at Saucon Valley Elementary School, where S.H. is

employed as a third grade teacher.  G.L.'s history of behavioral problems began in Kindergarten

and his diagnoses include: Bipolar Disorder, Obsessive Compulsive Disorder, Intermittent

Explosive Disorder, Pervasive Developmental Disorder - not otherwise specified, Adjustment

Disorder, Posttraumatic Stress Disorder and mood disorder.

       In May of 2013, G.L.'s emotional and psychological state significantly

deteriorated.  He threatened to kill three peers and expressed suicidal ideation.  He was

hospitalized twice prior to his return to school in August of 2013.  (H.O. Finding Nos. 5, 6.)  As

of May 28, 2013, G.L. transitioned from partial hospitalization at Kids Peace to partial

hospitalization at The Horsham Clinic.  The Horsham Clinic discharged G.L. on or about May

31, 2013. ln addition to disturbing behaviors such as hearing voices and seeing spirits, by the

summer of 2013, G.L. was evidencing obsessive sexual thoughts.  (H.O. Finding No. 9.) Prior to

G.L.'s return to school in the Fall of 2013, S.H. provided the reports of G.L.'s treatment teams

from the hospitalizations to the District. (H.O. Finding Nos. 10, 11.)

       On August 29, 2013, the IEP Team, including S.H., met to revise G.L.'s IEP.  At

the IEP Team meeting, the School District received The Horsham Clinic's Confidential

Psychological Consultation report and the Holcomb Behavioral Health Systems' evaluation

report.[5]  On August 29, 2013, the School District issued a Permission to Reevaluate consent form

---

[5]      The Horsham Clinic's May 27, 2013, Confidential Psychological Consultation report notes that G.L. "may struggle with appropriately interpreting social cues. He may jump to conclusions based on insufficient information."  The June 17, 2013, Holcomb Behavioral Health Systems evaluation report states that Mother reported

to conduct a comprehensive assessment including a Functional Behavioral Assessment ("FBA"). S.H. signed the consent for the reevaluation on September 4, 2014.  (H.O. Finding No. 12.)  On September 3, 2013, school staff developed and issued a crisis plan for G.L.  Carol Tavormina, G.L.'s 4th Grade teacher, described G.L.'s behaviors at the very start of the school year, implementation of the crisis plan and behavioral coordination with Russ Carawan to address G.L.'s behaviors, and how she successfully implemented the plan and to attain instructional control of G.L.  Russ Carawan, the School District's mental health treatment specialist, commenced observing G.L. and recording observation notes, and developing a Functional Behavioral Assessment ("FBA") using a state format.  Russ Carawan observed G.L., observed no behaviors,  and found that Carol Tavormina was implementing appropriate strategies and had G.L. under instructional control.

On October 21, 2013, G.L. became severely agitated during a family-based therapy session in which his father, K.L., as well as his mother, S.H., was present. (H.O. Finding No. 19).  G.L. also threatened school personnel. (H.O. Finding No. 21.) He was admitted to Kids Peace on that date and apparently remained there until October 30, 2013.[6]  On November 6, 2013, the IEP Team met to consider program supports pending transition to the recommended

---

"that [G.L.] really picks up on social cues inappropriately. He will say that he is being bullied and the mother would know the children he is talking about and they are not necessarily bullying him."  The August 27, 2013, Holcomb Behavioral Health Systems Psychological Evaluation states that "[a]ccording to mom, [G.L.] states, 'I hear voices,' however she questions the reliability for the presence of the same."

The Horsham Clinic's May 27, 2013, Confidential Psychological Consultation report notes "collateral sources are not available for interview," and mentions only S.H. and G.L. within the report as providing information. The June 17, 2013, Holcomb Behavioral Health Systems evaluation report identifies G.L. and his mother as the only informants.  The August 27, 2013 Holcomb Behavioral Health Systems Psychological Evaluation report identifies G.L. and S.H. as the only informants.

[6]      The October 31, 2013 Kids Peace Psychiatric Evaluation report identifies only G.L. as an informant and takes S.H.'s input as provided in prior reports.

Partial Hospitalization Program ("PHP") where G.L. would receive full-time special education Emotional Support at the Asa Packer Elementary School in the Easton Area School District featuring, among other things, medical-based treatment plans, psychiatrist supervision, and monthly team meetings that included S.H.  On November 11, 2013, Russ Carawan shared the FBA with the school team and, prior to that, provided all the information to S.H.

School District staff developed an informal crisis/behavior support plan to support G.L. in the interval before transition to the PHP.  On November 14, 2013, the IEP Team met to revise G.L.'s IEP as he transitioned to the PHP.  On November 14, 2013, S.H. approved the Notice of Recommended Educational Placement/Prior Written Notice ("NOREP") to confirm G.L.'s change of placement to the Full-Time Emotional Support Program/PHP.  The School District confirmed its financial responsibility for the PHP.  On December 5, 2013, the School District issued the Reevaluation Report ("RR") which changed G.L.'s IDEA identification to Emotional Disturbance and also concluded that he no longer qualified for speech/language services. (H.O. Finding No. 27.)  G.L.'s placement in the PHP began on November 14, 2013 and lasted until November 3, 2014. (H.O. Finding No. 24.)

On December 11, 2013, G.L. was readmitted to inpatient hospitalization at Kids Peace.  (H.O. Finding No. 29.) The IEP Team, including S.H., met on January 2, 2014. On January 9, 2014, an Individualized Education Plan ("IEP") was developed for G.L. which did not note behaviors interfering with learning as a concern for G.L. and did not contain any behavioral goals or include a positive behavior support plan.  (H.O. Finding No. 31.)  However, the January 9, 2014 IEP and the related January 10, 2014 Notice of Recommended Educational Placement ("NOREP") recommended G.L.'s continued placement in the PHP, a structured, therapeutic

emotional and behavioral support program.  The School District issued a NOREP dated January 10, 2014, recommending G.L.'s continued placement in the PHP, which G.L.'s parents did not return.  The information in the record from the PHP is very limited. PHP Treatment Plan Summaries and PHP Quarterly Progress Reports are included at S-30 and S-31, respectively.[7]

Staff at the PHP completed a Functional Behavioral Assessment ("FBA") on May 29, 2014 which details G.L.'s behavioral history, including the following:

> He can make himself vomit and may cough and throw up when over excited.  G.L. has eloped from the classroom in the past.  He was reportedly oppositional, defiant, and does not want to follow rules.  He wants to do want he wants to do. He acknowledges a history of throwing multiple temper tantrums per day at home and at school where he becomes loud, screams, curses, hits people, slams doors and makes threats.  He has threatened to harm his school principal in the past.  He reports that he gets irritated, angry and rageful very easily to the point where he made a suicidal gesture of taking a knife to his throat but did not hurt himself; G. has experienced four psychiatric hospitalizations during the 2013-2014 school year.

(S-26.)  On the basis of the FBA, a Revision IEP dated June 5, 2014 was developed to formally include the FBA and a Positive Behavior Support Plan ("PBSP").  (H.O. Finding No. 36.)   The IEP Team formally added the FBA and PBSP to G.L.'s IEP through a Revision IEP dated June 5, 2014. This was the first time that G.L.'s educational program included a FBA and PBSP.

During the Summer 2014, G.L. participated in the Intermediate Unit's Summer Support Program.  On September 8, 2014, Dr. Saxena, the PHP psychiatrist, indicated that "[G.L.] should be referred for further sexual risk assessment and treatment. Monitor his behaviors all the time" (P-6, page 5), but the PHP took no action to follow through with the

---

[7]       The February 12, 2014 Treatment Plan Summary notes that G.L. reports visual and auditory hallucinations but that the psychiatrist believes G.L.'s reports are a means for avoidance, and that S.H. "also believes the hallucinations are associated with avoidance and manipulation to avoid attending school and PHP."

recommendations of their psychiatrist.  In October of 2014,  G.L. eloped from the PHP and was restrained by staff, but this incident was not reported to S.H.  (H.O. Finding No. 41.)

Throughout this time, G.L. reported increasing obsessive sexual thoughts.  S.H. and his therapist testified at length regarding the severity of G.L.'s sexual obsessions, anger, impulsivity and compulsion, and sexual comments from peers and bullying increased G.L.'s obsessive thoughts.  G.L. reported to S.H. negative peer interactions and bullying and she had significant challenges getting G.L. to school in the morning.  On November 3, 2014, the IEP Team met and issued a Revision IEP to prepare for G.L.'s discharge from the PHP and placement in the Intermediate Unit's full time Therapeutic Emotional Support ("TES") class housed at Easton Middle School.  Although mentioned in a September 8, 2014 psychiatrist's note and the September 26, 2014 Treatment Summary, the PHP psychiatrist's November 7, 2014, discharge summary contains no mention of psycho-sexual concerns.  Consistent with the documents, psycho-sexual concerns were not discussed at the discharge meeting.  G.L.'s participation in the PHP was marked by overall emotional and behavioral progress as noted in the Treatment Plan Summaries.

On January 12, 2015, in advance of an upcoming IEP Team meeting, the Intermediate Unit staff updated G.L.'s PBSP. G.L. was ten years old and in the fifth grade. On January 13, 2015, the parties met as an IEP Team with respective counsel present and developed a new annual IEP and continued placement in the I.U. therapeutic emotional support class. Correspondence from the District's attorney memorialized the discussion of this meeting, noting that the January 13, 2015 discussion centered on two specific concerns: placement and attendance.  The letter also notes that the IEP Team, including S.H. and Plaintiffs' counsel,

agreed upon the following changes and actions:

1.  Consideration of possible placement options is deferred pending completion of the psycho-sexual evaluation and receipt of all other evaluations, such as the I.U. psychiatric evaluation, which may not have been available to all necessary persons.  Parent will sign whatever releases are required in order to allow the School District to obtain the report (and other records that the I.U. has not provided based on consent concerns).

2.  The IEP will provide for a "safety plan" to monitor G.L. in order to assure safety for self and others given his expressions of sexual interest in others, including a specific female student.  S.H. did not disclose the name of the girl concerned, but will inform appropriate school staff of the name of the girl mentioned by G.L.

3.  Health Class will be removed from G.L.'s schedule, which is anticipated to relieve stress and anxiety as he has expressed concerns about the class and images in the materials.  In particular, he has expressed to S.H., but not to staff, that Health Class is among the reasons he does not want to attend his current program.

4.  The IEP will bolster current counseling services to provide that individual counseling will address G.L.'s perceptions of events at school.  In particular, he reports to S.H. worries of being bullied, of not having friends, and similar social unease, while staff state that in school the reality is quite the opposite of what G.L. is reporting.  Believing that skewed perceptions are another cause of anxieties related to the school attendance issues manifesting at home, the IEP Team decided to use the counseling time, including some time during 6th period now available as a result of dropping Health Class, to address perceptions.

5.  S.H. will communicate to the school, with Mr. Palos [the Intermediate Unit emotional support teacher, and the teacher in charge of G.L.'s therapeutic emotional support class] as her point of contact, about G.L.'s reports at home concerning his school perceptions.  The home-school communications should assist the counselor, and staff generally, in working with G.L. regarding his perceptions.

6.  The school will develop a schedule of activities for G.L. to work on during the 6th period.  The activities may include dialogue with Mr. Palos as well as positive reinforcing and not punitive activities (e.g., no "make-work" activities) to provide a positive in-school experience for G.L., which should also assist in addressing his adverse perceptions from his current school setting.

7.  The responsible I.U. staff member will assist S.H. with fully completing an

9

application for Medical Assistance that the Team hopes will lead to in-home BHRS for G.L. and the family.  Of course, the school system can only support her and cannot decide whether G.L. will qualify.

8.  After receiving the pending psycho-sexual evaluation, the School District will assume financial responsibility and pay the evaluator for the report.

9.  The IEP Team will meet again after receiving the psycho-sexual evaluation.

(A.R., Ex. 8; S-36.)

About this time period, G.L. reported to his mother that he was having certain difficulties with peers.  Also during this time frame, parental concerns about G.L.'s reported sexual obsessions came to the fore.  The A.R. contains emails which were exchanged between S.H. and G.L.'s teacher memorializing G.L.'s reports to his mother in late January and early February of 2015.[8]

In April 2015, S.H., through counsel, provided to the School District a letter from Valliere & Counseling Associates, Inc., concerning its February and March evaluation and intake attempts with G.L., but does not offer any educational recommendations. Valliere & Counseling Associates, Inc., could not proceed with services because it did not have consent to treat G.L. from G.L.'s father.

G.L. remains in the TES placement.   He continued to have significant difficulties with his peers with bullying and sexual comments and reported these concerns to S.H. and therapist.  He had meltdowns, perseverative thoughts, displayed anger and made threats.  (H.O. Finding No. 59.) These difficulties were testified to at length by S.H. and some incidents are

---

[8]        S.H. and Mike Palos, G.L.'s emotional support teacher, exchanged emails on January 5, 2015, addressing a few matters (including a recommended partial program at Kids Peace), with Mr. Palos writing "that the behavior [G.L.] displays at home in regards to refusal to go to school in the morning does not translate to his behavior in school each day. Only by our ongoing communication do we know that [G.L.] had difficulties in the morning."

detailed in email correspondence between S.H. and G.L.'s TES teacher. (A.R., P-7.)  G.L.'s

sexual urges increased and he indicated a desire to have sex with girls at school and sought

opportunities to meet girls. (H.O. Finding No. 57.)  However, TES staff reported that G.L. did

well at school and claimed to be unaware of his social difficulties.

On April 30, 2015, S.H. brought a due process complaint pursuant to the IDEA

seeking an appropriate placement for G.L. and compensatory education beginning in April of

2013.  S.H. sought G.L.'s placement at Souderton Vantage Academy.  A due process hearing was

held over the course of three hearing sessions on June 19, 2015, August 31, 2015 and September

3, 2015.  During the first day of the hearing, the Hearing Officer ordered that G.L. should

undergo a psychosexual evaluation.  The Hearing Officer selected the evaluator and J.J. Peters

Institute completed the assessment before the second and third hearing sessions.  The August,

2015 J.J. Peters Institute's Comprehensive Biopsychosocial Evaluation – Psychosexual report

("J.J. Peters report") indicates a need for certain medical-based and family supports, that could be

coordinated with G.L.'s IEP, but not specific education-based recommendations.[9]  The J.J. Peters

report recommends BHRS and family-based services and confirms that "[S.H.] and [G.L.] denied

that [G.L.] ever received family-based services or [BHRS]."

During the hearings, G.L.'s treating therapist, Erik Young, endorsed features of an

"intensive emotional support class" that are features of the Intermediate Unit's therapeutic

emotional support class, such as continuum of care, licensed social workers and clinical

---

[9]       The J.J. Peters report notes that S.H. "commented that his [G.L.] lying is an ongoing issue. She
elaborated that there are 'layers' to the situation because [G.L.] may lie about something, then lie about lying, and
the lie about telling any lies in a given scenario. [S.H.] added that [G.L.] can be 'very adept at lying at times.' "  The
only informants for the J.J. Peters report are S.H. and G.L.

supervisors, trauma-informed training, socials skill curriculum, and violence prevention curriculum.[10]  The Intermediate Unit's therapeutic emotional support classroom provides a complete range of emotional support services and resources on-site and in-house.  The I.U. therapeutic emotional support staff have significant experience working with children similar to G.L., in both mental health and educational settings.[11]  No one who instructed G.L. in the PHP testified at the hearing but Lorraine Sulik, the Program Director at Souderton Vantage Academy, testified regarding her opinion of how Vantage Academy can provide for G.L.'s needs and address the recommendations in the J.J. Peters report.

H.O. Culleton found the following:

> Parents have agreed to provide Student with specialized psychosexual therapy to address Student's obsessive thoughts and compulsive behaviors of a sexual nature.  In addition, Student continues in therapy for emotional regulation, anger management and frustration tolerance.  (H.O. Finding No. 64.)

> Student needs a placement that is located in a small group setting and is provided in a small special education classroom, and that provides Student with protection against aggressive or hostile peer behavior.  (H.O. Finding No. 65.)

> Student needs specially designed instruction and related services that include a crisis management plan and safety plan including control over access to sharp objects; full time one-to-one monitoring at the level of eye contact/line of sight, to prevent self-harm, sexual acting out and attempts to access sexual activity; increased availability of monitoring and data-gathering on Student's behavior, with consultation by a Board Certified Behavior Analyst, and a research-based positive behavior support plan, revised as needed to support Student's behavior; social skills training (including pragmatic language and training on bullying and its prevention in the school setting) through explicit teaching, reinforced in the

---

[10]     G.L.'s treating therapist, Erik Young, testified to G.L.'s inability to accurately read "social cues, nonverbals, he tends to misattribute what people are saying, what people are doing in a very negative way towards him."  G.L.'s treating therapist's information and opinion is based on G.L.'s and S.H.'s reports only.  Clinicians did not contact school staff.

[11]     Mike Palos, G.L.'s emotional support teacher, explained that G.L.'s perceptions are not consistent with observed reality.

> classroom setting; classroom coordination with and reinforcement of therapy in
> the areas of emotional self-regulation, anger management, frustration tolerance,
> age appropriate sexual education including sexual responsibility and refusal skills,
> and continued support for improving Student's slow reading.  (H.O. Finding No.
> 66.)

> Student's Parent needs home-based services through the behavioral health system
> and needs support for completing the necessary application forms and
> requirements.  This is needed in order to support Student's behavior management
> plan in the school setting.  (H.O. Finding No. 67.)

(A.R., Ex. 2, pp. 7-8.)  In his September 20, 2015 decision, Hearing Officer William Culleton,

Esquire, found that the District:

> did not fail to provide Student with a FAPE during any part of the  relevant period
> of time.  Hearing Officer intervention is not warranted, but in dicta I have urged
> the District to provide, on an emergent basis, the highly supportive special
> education and related services that the Student needs, as evidenced by the recent
> psychosexual evaluation report and the testimony of Student's therapist in this
> matter.

(Id. at 18.)  Thus, H.O. Culleton denied and dismissed the Plaintiffs' requests for relief.  G.L.

continues to be educated in the TES program with the same supports and services provided at the

time of the Hearing Officer's decision.

Plaintiffs filed the Complaint in this Court appealing H.O. Culleton's decision on

December 3, 2015, and an Amended Complaint was filed on January 8, 2016.  Plaintiffs contend

that the H.O.'s directives were never addressed by the District and the recommendations in the

J.J. Peters report were not implemented.

## II.    STANDARD OF REVIEW.

In reviewing an appeal from a state administrative decision under the IDEA,

district courts are required to apply a nontraditional standard of review, sometimes referred to as

a "modified de novo review."  Nicholas H. v. Norristown Area Sch. Dist., Civ. A. No. 16-1154,

2017 WL 569519, at *3 (E.D. Pa. Feb. 13, 2017)(citing D.S. v. Bayonne Bd. Of Educ., 602 F.3d

553, 564 (3d Cir. 2010) and Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 241 (3d Cir. 2009)).

The court is required to make its own findings by a preponderance of the evidence while also

giving due weight to the factual findings of the ALJ.  Id. (citing Mary T., id. (quoting Shore

Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004)). See also S.H. v.

State Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 269-270 (3d Cir. 2003); Bd. of

Educ. v. Rowley, 458 U.S. 176, 206 (1982).  A reviewing "court's inquiry under § 1415(e)(2) is

two-fold.  First, has the State complied with the procedures set forth in the Act?  And second, is

the individualized education program developed through the Act's procedures reasonably

calculated to enable the child to receive educational benefits?"  Nicholas,  2017 WL 569519, at

*5 (quoting Rowley, 458 U.S. at 206-207).  Further,

> In addition, if a state administrative agency has heard live testimony and has
> found the testimony of one witness to be more worthy of belief than the
> contradictory testimony of another witness, that determination is due special
> weight.  Specifically, this means that a District Court must accept the state
> agency's credibility determinations 'unless the nontestimonial, extrinsic evidence
> in the record would *justify* a contrary conclusion.' (emphasis added).  In this
> context the word 'justify' demands essentially the same standard of review given
> to a trial court's findings of fact by a federal appellate court.

Shore Regional, 381 F.3d at 199 (citations omitted).  The district court "may reach an

independent decision, except that it must accord the decision of the [hearing officer] 'due weight'

in its consideration." Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 524 (3rd Cir. 1995), cert.

denied, 517 U.S. 1135 (1996). "Due weight" means "[f]actual findings from the

administrative proceedings are to be considered prima facie correct." S.H., 336 F.3d at 270.  If

the court departs from the administrative findings, it must detail why. Id. The burden of proof is

on the party bringing the administrative complaint, here the Plaintiffs, a burden that continues on

appeal. Schaffer v. Weast, 546 U.S. 49 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384 (3rd

Cir. 2006).

**III.    DISCUSSION.**

 **A.    The Hearing Officer's Conclusions of Law.**

  The Hearing Officer found the following with respect to whether the Defendant

provided G.L. with a FAPE during both G.L.'s Fourth and Fifth Grades.

> PLACEMENT AND PROVISION OF A FAPE - APRIL 30, 2013 TO END OF
> FOURTH GRADE
>
>  . . . I conclude that the District provided Student with a FAPE during the
> relevant period ending on the last day of Student's fourth grade year.  Based upon
> what it knew as of April 30, 2013, the District reasonably bolstered its regular
> education services to address inappropriate behaviors, and its methods were
> successful for a time. During the bulk of the ensuing period of time, Student was
> placed in a highly structured, highly restrictive school-based partial hospitalization
> program, pursuant to a medical prescription. The record shows that this placement
> was appropriate for Student. While the District did commit procedural violations
> of the IDEA, Parent has not proven by a preponderance of the evidence that any of
> these violations produced a substantive denial of a FAPE.
>
>  As noted above, the District'[s] actions with regard to Student during this
> period of time must be judged by what the District knew at the time. Student had
> exhibited both problematic and peculiar behaviors at a very early age. Some of
> these behaviors were disruptive in the school environment, and the District is
> charged with notice of these behaviors. Nevertheless, the District also was aware
> that its regular education teachers had established educational control and had
> proven able to educate Student while controlling Student's propensity to engage in
> inappropriate behaviors. Thus, it is not charged with notice that a change of
> educational placement was necessary in the beginning of the 2013-2014 school
> year.
>
>  Therefore, when District personnel met with Parent in August 2013 to
> discuss two private evaluations that Parent had obtained over the summer of 2013,
> they had good reason to believe that Student's regular education teacher could
> bring Student's behaviors under educational control by utilizing behavior
> management techniques prescribed by the District's behavior specialist. Its
> behavior specialist joined the meeting with Parent, listened to Parent's concerns

about Student, and devised an interim behavior management plan with the objective of extinguishing a cluster of behaviors that Student was likely to demonstrate in the classroom, and that all participants believed would likely serve the function of escape from Student's educational program and its demands. The specialist trained the classroom teacher to implement this plan, and the record is preponderant that the teacher implemented it with sufficient fidelity to successfully modify Student's behavior and obtain Student's classroom participation and access to the curriculum. I conclude that the District's approach, based upon continuing Student's placement in regular education with specialized behavior supports, was reasonably calculated to provide Student with the opportunity to receive meaningful educational benefit.

   At the same August meeting, the District began the process of obtaining a re-evaluation of Student for purposes of reviewing Student's need for special education under the IDEA, and in particular, to review Student's classification. The District received Parent's written permission to evaluate on September 4, 2013. Therefore, the District had until November 3, 2013 to complete its re-evaluation. During this period, Student remained in regular education, because Student's current classification was Speech or Language Impairment, which did not require a more restrictive setting. Based upon what the District knew, and based upon the apparent success of its interim behavior management plan, I conclude that it was not unreasonable for the District to defer any change of placement until after receiving a comprehensive re-evaluation.

   The District did not meet the deadline specified by the IDEA and Chapter 14 (the Pennsylvania regulations implementing the IDEA) for delivering its re-evaluation report. It made its re-evaluation report available on December 5, 2013, more than one month late. This was a procedural violation, and I note that the District is obligated to ensure that its re-evaluation reports comply with IDEA timelines in all cases. Nevertheless, an administrative hearing officer is not authorized to find a deprivation of a FAPE unless a procedural violation deprives a parent of the opportunity to participate in the IEP process or impedes or deprives a child of meaningful educational benefit. 34 C.F.R. § 300.513 (a)(2).

   Parent has not proven by a preponderance of the evidence that the late re-evaluation report resulted in a deprivation of her participation in educational planning for Student. Parent participated in the original August 2013 meeting, which resulted in both the crisis prevention plan and a modification of regular education classroom procedures in order to address Student's behaviors. Parent worked in the same building with Student's classroom and teacher, and the record reflects that Parent was able to communicate with Student's teacher about Student's progress while at school.

   To the extent that the District's lateness could have caused a deprivation of parental participation, its impact on parental participation would have been obviated by a supervening event. On October 21, 2013, before the re-evaluation report was due under the law, Student was hospitalized after an exacerbation of

Student's emotional disabilities because of Student's presence at a school meeting with the family, including Student's Father. The evidence is not preponderant that the Student's educational program had caused this recurrence of symptoms. Rather, the evidence more strongly supports the conclusion that this recurrence was caused by Student's proximity to Student's father, mother and sibling at the meeting, which triggered deepseated pathology, directly causing behavioral dyscontrol.

Thereafter, Student's placement and special education services were driven and directed by medical recommendations, in which Parent participated. The hospital prescribed the highly restrictive and supportive PHP. The District was called upon to be a financial guarantor in this placement, and assumed that responsibility. Within a month of Student's hospitalization, the District completed a change of placement to this appropriate setting, and revised Student's IEP, with parental participation. Therefore, I find that the District's late re-evaluation report did not cause such a deprivation of parental participation as to constitute a denial of a FAPE.

Nor did the late re-evaluation report impede or deprive Student of educational benefit. As discussed above, Student received access to meaningful educational benefit until October 21, 2013, when Student's emotional disabilities became exacerbated, leading to inpatient hospitalization on the next day. The record is unclear how many days Student remained in hospital, but the District convened an IEP meeting to devise an emergent plan to receive Student back from hospital to the regular education classroom on November 6, 2013, anticipating a return on November 7. Student attended on November 11, and was placed in the school based partial hospital program by November 14, 2013. Any lack of meaningful educational benefit during this interim period of time could not be attributed to a late re-evaluation report on the record in this matter.

Parent argues that the District promised an FBA in August 2013 and did not deliver it until May 2014. I conclude to the contrary. The evidence establishes by a preponderance that the District's behavior specialist directed the special education teacher to keep some data, made his own observations on multiple occasions, and obtained other observations by other District staff.  The specialist gathered this and anecdotal reports by District staff, then developed an FBA, utilizing a system received from the Pennsylvania Department of Education. He conveyed the results to Parent on November 7, 2013. These results confirmed the successful behavior control strategy that had been implemented from the beginning of the school year.

This FBA became inoperative within days, when on November 14, Student entered the PHP. As noted above, circumstances had changed by October 21, and this FBA was no longer useful, due to the change in placement.

Parent suggests that the November 7 report to Parent either was not an FBA or was so inadequate as to deprive Student of a FAPE. Parent points to the lack of systematic behavior definitions and data-taking. While the process utilized

17

was not as thorough and systematic as might be desired, it can still be called an FBA, and the District expert's opinion on this question is preponderant on this record. Moreover, there is no IDEA definition of FBA, nor is there a requirement for an FBA, or any particular kind of FBA, outside the discipline context under the IDEA.

Parent notes that the District's January 2014 revision of the IEP did not acknowledge that Student's behaviors interfered with learning and that the revision did not include an FBA for the new placement at the PHP. I conclude that the IEP was procedurally deficient in this regard under Chapter 14 (requiring an FBA whenever behavior impedes learning). 22 Pa. Code § 124.133(a). There is no doubt that the negative effect of behavior should have been acknowledged at this point, with Student in a highly restrictive setting. However, I also conclude that the procedural violation did not cause a deprivation of a FAPE, because Parent participated in the IEP meeting, and because the PHP had a class-wide behavior management plan that proved over time to be sufficiently effective for Student that Student was able to receive meaningful - if not maximal - educational benefit.[fn6]

> fn6. Student's IEPs indicate that Student was delayed in reading ability, based upon reported grade level of achievement on standardized tests. The January IEP called for small group teaching and goals directed to improving Student's reading. On this evidence I do not find a deprivation of a FAPE with regard to reading. One IEP noted below-grade achievement in writing and spelling, but the record is insufficient to reach a finding on these areas of curriculum.

The PHP placement yielded slow but meaningful progress with regard to Student's escape behaviors and Student's classroom participation and access to the curriculum. Not only did the PHP's systematic behavioral evaluation show progress on a monthly basis starting in Spring 2014,[fn7] but also, Student made meaningful progress in reading comprehension during the period of time. Therefore, I conclude that Parent has failed to prove by a preponderance of the evidence that the Student did not receive a FAPE during this period.

> fn7.  Evidence showed that Student escaped from the PHP building about a month before discharge; staff restrained Student but did not report this as required by Pennsylvania regulations. While this impeded Parent's participation by definition, it did not prevent Parent from such access as to lead to any major decisions being made without her.  While this represented a behavioral setback, there is no evidence that it delayed discharge or otherwise deprived Student of meaningful educational benefit.

The PHP placement extended into the next school year, and I find no evidence to disturb the above conclusions for the period from the beginning of fifth grade until Student's discharge from the PHP in November 2014.

PROVISION OF A FAPE IN STUDENT'S FIFTH GRADE YEAR

As noted above, the evidence shows that Student was not deprived of a FAPE while in the PHP in the first months of fifth grade. In November 2014, Student had made sufficient progress that the PHP discharged Student to a less restrictive setting, a full-time therapeutic emotional support classroom in a public middle school (TES).

While in the TES program in the middle school, Student continued to report serious emotional issues to Parent and to Student's therapist. However, many of Student's claims about events at school were contradicted by the absence of any evidence of them happening at school.[fn8]  The Student's teacher and the program supervisor both consistently and credibly reported that Student did not experience significant difficulties with emotional regulation, unhappiness, social relationships or school performance. Student did not report Student's sexual thoughts to school staff to a significant extent. Student did not make significant threats of self harm or intention to harm others, and did not engage in skin-picking or self harm behaviors.

> [fn8] I make no finding as to whether or not Student engaged in behavior designed to provide the opportunity for sexual acting out, such as making excessive trips to the bathroom. The psychosexual risk assessment recently obtained is sufficient cause to ensure that the District provide robust protective measures against such activity.

I conclude that the evidence is not preponderant that the TES program failed to provide Student with a FAPE. The evidence is contradictory. On one hand, Student reported serious difficulties at school to Student's Parent and therapist; however, the school witnesses credibly testified that Student was doing well there and experiencing none of the extreme difficulties that the Student had reported to Parent. The record is replete with credible testimony, parental admissions during medical history interviews, and examples of the fact that Student is not a reliable reporter of facts.

Therefore, although I find Parent to be credible, her reports as to Student's serious problems at school are almost entirely based upon Student's reports. Nor did Student's current therapist, whose testimony was entirely credible, base his conclusions upon any evidence from collateral sources such as school personnel; his opinions were based entirely upon parental reports and those of the Student. Weighing the testimony, then, I conclude that Student's unreliable reports, the

basis for much of Parent's testimony about the District's implementation of Student's program and the benefit that Student received from it, must be given less weight than the consistent and credible reports of Student's teachers in the TES program. Consequently, Parent's factual claims about this program, to the extent that they indicate a failure to provide a FAPE, must fail.

(A.R., Ex. 2, pp. 11-18.)

### B.    The IDEA Generally.

In Munir v. Pottsville Area Sch. Dist., 723 F.3d 423 (3d Cir. 2013), the United

States Court of Appeals for the Third Circuit ("Third Circuit") reiterated that to satisfy the IDEA,

the school district must offer an IEP that is "reasonably calculated to enable the child to receive

meaningful educational benefits in light of the student's intellectual potential." Id. at 426

(quoting P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 729-30 (3d Cir. 2009) (quoting Shore

Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004)).  Further,

> [i]f parents believe that the school district is not providing a FAPE for their child,
> they may unilaterally remove him from the school, enroll him in a different
> school, and seek tuition reimbursement for the cost of the alternative placement.
> Id. at 242 (citing 20 U.S.C. § 1412(a)(10)© and Sch. Comm. of Burlington v.
> Dep't of Educ., 471 U.S. 359, 374, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985)).
> Parents who change their child's placement without the consent of state or local
> officials, however, "do so at their own financial risk." Burlington, 471 U.S. at
> 373-74. A court may grant the family tuition reimbursement only if it finds that
> the school district failed to provide a FAPE and that the alternative private
> placement was appropriate. See Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S.
> 7, 15-16, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993); Mary T., 575 F.3d at 242.
> Courts also have broad discretion to consider equitable factors when awarding
> tuition reimbursement. Florence Cnty. Sch. Dist., 510 U.S. at 15-16.

Munir, 723 F.3d at 426.  School districts provide FAPE by designing and administering a

program of individualized instruction that is set forth in an Individualized Education Plan

("IEP").  Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 240 (3d Cir. 2009).  Judge J. Curtis

Joyner of this District thoroughly discussed the IDEA and the requirements of an IEP recently in

20

Nicholas v. Norristown Area Sch. Dist., CIV. A. 16-1154, 2017 WL 569519 (E.D. Pa. Feb. 13,

2017), stating:

> "[t]he IEP must be 'reasonably calculated' to enable the child to receive
> 'meaningful educational benefits' in light of the student's 'intellectual potential.'"
> [D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010)] (quoting Shore
> Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) and
> Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-85 (3d Cir.
> 1988)). A "meaningful benefit" must entail "more than a trivial educational
> benefit," but it does not have to maximize the child's potential. [Norristown Area
> Sch. Dist. v.] F.C., 636 Fed. Appx. at 861 (quoting L.E. v. Ramsey Bd. Of Educ.,
> 435 F.3d 384, 390 (3d Cir. 2006) and D.S. v. Bayonne, 602 F.3d at 556). Because
> an education is "specially designed" if the IEP is made "in light of the student's
> intellectual potential," whether an education is "appropriate" depends upon the
> individual child's abilities and needs. Id. (quoting Chambers v. Sch. Dist. of Phila.
> Bd. of Educ., 587 F.3d 176, 182 (3d Cir. 2009)).

Id. at *4-*6.

### C.   Parties' Arguments.

Plaintiffs present the following three issues in their Motion:

1.   Did the Hearing Officer err in his finding that G.L. was an "unreliable
     reporter of events at school" and in the corresponding conclusions that
     G.L. did not evidence the reported behaviors in the school setting? Did
     these conclusions ignore the substantial evidence contained in the
     testimony of Mother, Therapist, private doctor reports and the IEE ordered
     by the Hearing Officer?

2.   Did the Hearing Officer err as a matter of law in finding that the untimely
     RR, and the district's failure to conduct an FBA and develop a PBSP were
     procedural errors only that did not result in a denial of FAPE to G.L.?

3.   Did the record contain evidence to support the Hearing Officer's
     conclusions that the services provided by the district to G.L. were
     appropriate; that G.L made meaningful educational progress; and that the
     behavioral services provided by the district were sufficient to meet G.L.'s
     needs?

Pl. Br., pp. 7-19.  In the Defendant's Motion, the following arguments are presented:

1.     The hearing officer properly found procedural errors did not deprive G.L. of a FAPE.

2.     Plaintiffs' generalized challenge to the sufficiency of evidence supporting services, progress, behavioral assessment, and provision of a FAPE

3.     The Hearing Officer correctly weighed G.L.'s reports

4.     The hearing officer properly considered the J.J. Peters Comprehensive Biopsychosocial Evaluation – Psychosexual report

5.     The record as a whole supports the Hearing Officer's decision and order.

Def.'s Br., pp. 4-17.

**D.     Whether the H.O. Correctly Weighed G.L.'s Reports.**

Plaintiff's first argument and Defendant's third argument involve the H.O.'s credibility determination that G.L. was an "unreliable reporter of events at school" and the corresponding conclusions that G.L. did not evidence the reported behaviors in the school setting.  These arguments are examined together.

Plaintiffs note that the H.O.'s finding that G.L. is an unreliable reporter of facts resulted in a negative credibility determination of the testimony of S.H. and Erik Young, G.L.'s therapist, private doctor reports and the J.J. Peter's evaluation ordered by the H.O.  Plaintiffs' concern about the Hearing Officer's credibility finding is that G.L.'s perceptions and thoughts and his inability to cope with those thoughts create a vital need for supports and services which Plaintiffs contend the District continues to fail to meet. Plaintiffs further argue that, in dismissing G.L.'s claims as unreliable, both the Hearing Officer and the District failed to acknowledge G.L.'s intensive emotional, behavioral and mental health needs.  It is Plaintiffs position that any deference due to the Hearing Officer must fail because his conclusions are based upon the faulty

22

analysis that G.L.'s difficulties with reporting facts undermines the Plaintiffs' entire case.

Plaintiffs argue that "[t]here is nothing in the [J.J. Peters Comprehensive Biopsychosocial Evaluation - Psychosexual] report that contradicts the testimony of mother or Mr. Young. There is nothing in this report that would support the conclusion that G.L. is an unreliable reporter thereby discrediting the evidence presented by his mother at hearing." Pls.' Mem. in Supp. at 10. In the same report, however, it is stated that "[G.L.] stated that he tells lies, . . . . Ms. [S.H.] commented that this is an ongoing issue. She elaborated that there are 'layers' to the situation because [G.L.] may lie about something, then lie about lying, and then lie about telling any lies in a given scenario. Ms. [S.H.] added that [G.L.] can be 'very adept at lying at times.'" H.O. Decision, Ex. 3, p. 4. See also, Id. at 4 ("[G.L.] claimed to have lied about hearing the spirits and voices.") and 10 (noting G.L. stating he "pretended to be sick" to avoid school participation). Defendant correctly notes that it is not a matter of contradiction, but agreement that G.L. is not a reliable reporter.

"A District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Shore Regional High Sch. Bd. Of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004)(Alito, J.) (citing Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995)). The hearing officer found "[s]tudent is and was an unreliable reporter of events at school, often either misinterpreting social interaction or making false statements." (H.O. Finding No. 15.) The hearing officer cited testimony given by Erik Young, G.L.'s treating therapist (N.T. at 63, 68-70), by Jessica Sawchuck, the School District's speech therapist (N.T. at 347-48), Carol Tavormina, G.L.'s 4th Grade teacher (N.T. at 379-83), Mike Palos, G.L.'s Intermediate Unit emotional support teacher

(N.T. at 424), as well as information in mental health reports including the Horsham Clinic Confidential Psychological Consultation report that G.L. "jumps to conclusions based on insufficient information"; the Holcomb Behavioral Health report noting, "[t]he mother notes that he really picks up on social cues inappropriately. He will say that he is being bullied and the mother would know the children he is talking about and they are not necessarily bullying him," and "[h]e seems to have no insight into his own behavior"; and the J.J. Peters Comprehensive Biopsychosocial Evaluation - Psychosexual report which notes "Ms. [S.H.] commented that [lying] is an ongoing issue. She elaborated that there are 'layers' to the situation because [G.L.] may lie about something, then lie about lying, and then lie about telling any lies in a given scenario. Ms. [S.H.] added that [G.L.] can be 'very adept at lying at times.'" The hearing officer also found that G.L. reported that he was being bullied by other students in the TES but that TES staff found no evidence to support this allegation. (H.O. Finding No.52.)  Nonetheless, the hearing officer noted that G.L. needed specially designed instruction and related services including "on-going behavior monitoring and data-gathering on Student's behavior, with consultation by a Board Certified Behavior Analyst, and a research-based positive behavior support plan, revised as needed to support Student's behavior; social skills training (including pragmatic language and training on bullying and its prevention in the school setting) through explicit teaching, reinforced in the classroom setting."  (H.O. Finding No. 66.)

        The evidence supports the H.O.'s credibility finding and shows reason to be cautious about G.L.'s stand-alone or unverified reports which are shown to be unreliable. There is no error in the hearing officer's weighing and treatment of the statements.

**E.     Whether the Hearing Officer Erred in Finding that Procedural Errors Did Not Result in a Denial of FAPE to G.L.**

Plaintiffs' second claim and Defendant's first claim presented in their motions are similar and based on the hearing officer's conclusion that the District's failure to timely complete a Reevaluation Report, conduct a Functional Behavior Analysis and develop a Positive Behavior Support Plan were dismissed by the Hearing Officer as procedural errors that did not result in a denial of FEPA to G.L.  Plaintiffs' contend that failing to conduct the assessments required to develop a plan to meet G.L.'s needs creates a substantive denial of FAPE.

1.     The Late Reevaluation Report ("RR").

Plaintiff argues that the late RR constituted a failure to timely assess G.L. The hearing officer directly opined:

> [T]he District had until November 3, 2013 to complete its re-evaluation. During this period, Student remained in regular education, because Student's current classification was Speech or Language Impairment, which did not require a more restrictive setting. Based upon what the District knew, and based upon the apparent success of its interim behavior management plan, I conclude that it was not unreasonable for the District to defer any change of placement until after receiving a comprehensive re-evaluation.
>
> The District did not meet the deadline specified by the IDEA and Chapter 14 (the Pennsylvania regulations implementing the IDEA) for delivering its re-evaluation report. It made its re-evaluation report available on December 5, 2013, more than one month late. This was a procedural violation, and I note that the District is obligated to ensure that its re-evaluation reports comply with IDEA timelines in all cases. Nevertheless, an administrative hearing officer is not authorized to find a deprivation of a FAPE unless a procedural violation deprives a parent of the opportunity to participate in the IEP process or impedes or deprives a child of meaningful educational benefit. 34 C.F.R. § 300.513 (a)(2).
>
> Parent has not proven by a preponderance of the evidence that the late re-evaluation report resulted in a deprivation of her participation in educational planning for Student. Parent participated in the original August 2013 meeting, which resulted in both the crisis prevention plan and a modification of regular education classroom procedures in order to address Student's behaviors. Parent worked in the same building with Student's classroom and teacher, and the

record reflects that Parent was able to communicate with Student's teacher about Student's progress while at school.

To the extent that the District's lateness could have caused a deprivation of parental participation, its impact on parental participation would have been obviated by a supervening event. On October 21, 2013, before the re-evaluation report was due under the law, Student was hospitalized after an exacerbation of Student's emotional disabilities because of Student's presence at a school meeting with the family, including Student's Father. The evidence is not preponderant that the Student's educational program had caused this recurrence of symptoms. Rather, the evidence more strongly supports the conclusion that this recurrence was caused by Student's proximity to Student's father, mother and sibling at the meeting, which triggered deepseated pathology, directly causing behavioral dyscontrol.

Thereafter, Student's placement and special education services were driven and directed by medical recommendations, in which Parent participated. The hospital prescribed the highly restrictive and supportive PHP. The District was called upon to be a financial guarantor in this placement, and assumed that responsibility. Within a month of Student's hospitalization, the District completed a change of placement to this appropriate setting, and revised Student's IEP, with parental participation. Therefore, I find that the District's late re-evaluation report did not cause such a deprivation of parental participation as to constitute a denial of a FAPE.

Nor did the late re-evaluation report impede or deprive Student of educational benefit. As discussed above, Student received access to meaningful educational benefit until October 21, 2013, when Student's emotional disabilities became exacerbated, leading to inpatient hospitalization on the next day. The record is unclear how many days Student remained in hospital, but the District convened an IEP meeting to devise an emergent plan to receive Student back from hospital to the regular education classroom on November 6, 2013, anticipating a return on November 7. Student attended on November 11, and was placed in the school based partial hospital program by November 14, 2013. Any lack of meaningful educational benefit during this interim period of time could not be attributed to a late re-evaluation report on the record in this matter.

(H.O. Decision, pp. 13-15.) This decision by the hearing officer is not violative of section

1415(f)(3)(E) of the IDEA involving the decision of the hearing officer, which states as follows:

(ii) Procedural issues

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies -

(I) impeded the child's right to a free appropriate public education;
(II) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a free appropriate public education to the parents' child; or
(III) caused a deprivation of educational benefits.

20 U.S.C. § 1415 (f)(3)(E) (ii).  The hearing officer's findings that the late R.R. did not deprive G.L. of a FAPE is supported in the record and Plaintiffs' claim in this regard fails.

2.     The FBA and the PBSP.

Plaintiffs next allege that the hearing officer erred "in finding that the District's failure to timely assess G.L., conduct a Functional Behavioral Assessment ("FBA"), and provide a Positive Behavior Support Plan ("PBSP")[12] were procedural errors."  The hearing officer found the District committed some procedural errors, but ultimately concluded that such errors did not deprive G.L. of a FAPE.  (H.O. Decision at 15-16.)  The hearing officer specifically found the following:

Parent argues that the District promised an FBA in August 2013 and did not deliver it until May 2014. I conclude to the contrary. The evidence establishes by a preponderance that the District's behavior specialist directed the special education teacher to keep some data, made his own observations on multiple occasions, and obtained other observations by other District staff.  The specialist gathered this and anecdotal reports by District staff, then developed an FBA, utilizing a system received from the Pennsylvania Department of Education. He conveyed the results to Parent on November 7, 2013. These results confirmed the successful behavior control strategy that had been implemented from the

---

[12]     A Positive Behavior Support is defined as follows:

Positive behavior support plans - A plan for students with disabilities and eligible young children who require specific intervention to address behavior that interferes with learning. A positive behavior support plan shall he developed by the IEP team, be based on a functional behavior assessment, and become part of the individual eligible young child's or student's IEP. These plans must include methods that utilize positive reinforcement and other positive techniques to shape a student's or eligible young child's behavior, ranging from the use of positive verbal statements as a reward for good behavior to specific tangible rewards.

12 Pa. Code § 124.133(b).

beginning of the school year.

    This FBA became inoperative within days, when on November 14, Student entered the PHP. As noted above, circumstances had changed by October 21, and this FBA was no longer useful, due to the change in placement.

    Parent suggests that the November 7 report to Parent either was not an FBA or was so inadequate as to deprive Student of a FAPE. Parent points to the lack of systematic behavior definitions and data-taking. While the process utilized was not as thorough and systematic as might be desired, it can still be called an FBA, and the District expert's opinion on this question is preponderant on this record. Moreover, there is no IDEA definition of FBA, nor is there a requirement for an FBA, or any particular kind of FBA, outside the discipline context under the IDEA.

    Parent notes that the District's January 2014 revision of the IEP did not acknowledge that Student's behaviors interfered with learning and that the revision did not include an FBA for the new placement at the PHP. I conclude that the IEP was procedurally deficient in this regard under Chapter 14 (requiring an FBA whenever behavior impedes learning). 22 Pa. Code § 124.133(a). There is no doubt that the negative effect of behavior should have been acknowledged at this point, with Student in a highly restrictive setting. However, I also conclude that the procedural violation did not cause a deprivation of a FAPE, because Parent participated in the IEP meeting, and because the PHP had a class-wide behavior management plan that proved over time to be sufficiently effective for Student that Student was able to receive meaningful - if not maximal - educational benefit.[fn6]

> fn6. Student's IEPs indicate that Student was delayed in reading ability, based upon reported grade level of achievement on standardized tests. The January IEP called for small group teaching and goals directed to improving Student's reading. On this evidence I do not find a deprivation of a FAPE with regard to reading. One IEP noted below-grade achievement in writing and spelling, but the record is insufficient to reach a finding on these areas of curriculum.

    The PHP placement yielded slow but meaningful progress with regard to Student's escape behaviors and Student's classroom participation and access to the curriculum. Not only did the PHP's systematic behavioral evaluation show progress on a monthly basis starting in Spring 2014,[fn7] but also, Student made meaningful progress in reading comprehension during the period of time. Therefore, I conclude that Parent has failed to prove by a preponderance of the evidence that the Student did not receive a FAPE during this period.

> fn7.  Evidence showed that Student escaped from the PHP building about a month before discharge; staff restrained Student but did not

report this as required by Pennsylvania regulations. While this impeded Parent's participation by definition, it did not prevent Parent from such access as to lead to any major decisions being made without her.  While this represented a behavioral setback, there is no evidence that it delayed discharge or otherwise deprived Student of meaningful educational benefit.

The PHP placement extended into the next school year, and I find no evidence to disturb the above conclusions for the period from the beginning of fifth grade until Student's discharge from the PHP in November 2014.

(H.O. Decision, pp. 15-17.)

The essence of Plaintiffs' argument is that G.L. was substantively denied a FAPE due to the District's failure to provide appropriate support for G.L.'s behaviors. A PBSP is required to be developed after completion of an FBA to address the needs of students whose behaviors impede their learning or that of others. 22 Pa. Code § 124.133(b). Plaintiffs contend that the failure of the District to complete an FBA or PBSP for G.L. until June of 2014 evidences a lack of a substantive response to his behavior and absent these documents, there is no evidence in the record that indicates any individualized response by the Defendant to G.L.'s behavioral needs.

Defendant correctly notes that Plaintiffs never argue that the PHP was not providing emotional-behavioral support and treatment to G.L. See N.T. 154-155 (suggesting otherwise, Parent testified to disagreeing with discharge from PHP and related supports and services).  Plaintiffs sidestep the PHP emotional-behavior support and treatment, asserting instead that "[t]here was not testimony at the hearing from staff in the PHP."  Pls.' Mem. in Supp. at 14.  Plaintiffs, however, bear the burden of proof in this regard and did not call PHP witnesses to elicit evidence in support of their burden.

29

3.    Adequacy of January 2014 IEP Behavior Supports.

Plaintiffs contend that the January 2014 IEP developed for G.L. while he was in the Partial Hospitalization Program ("PHP") "did not note behaviors as a concern" and "did not contain any behavioral goals or behavior plan." Am. Compl., ¶ 31. The hearing officer's finding that this procedural error was not harmful is sound because G.L. was by then in a highly controlled PHP to address emotional-behavioral concerns.  (H.O. Decision at 16.)  G.L. was, during the time addressed, placed via IEP and NOREP in a PHP for the purpose of addressing his emotional and behavioral needs through medical supervision.

Plaintiffs argue a procedural paperwork failure rather than substantive failure to provide emotional-behavioral support and treatment. The legally required content of an IEP, see 14 U.S.C. § 1414(d)(l)(A)(i), does not include categorical program details, e.g., re-stating the embedded services of learning support, or emotional support, or Autistic support programs, or even a PHP. The IDEA specifically states "[n]othing in this section shall be construed to require that additional information be included in a child's IEP beyond what is explicitly required in this section; . . . ." 14 U.S.C. § 1414(d)(l)(A)(ii). Citing to the state regulatory definition of a PBSP, Plaintiffs argue that the School District was required to develop a PBSP plan for G.L. even while he was in the PHP, asserting "[u]nder these circumstances, the law requires the completion of a PBSP based upon an FBA." Pls.' Mem. in Supp. at 14.

Federal law specifies only that behaviors need to be addressed.  20 U.S.C. § 1414(d)(3)(B) ("The IEP Team shall-(I) in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior; ...."); 34 C.F.R. § 300.324(a)(2) (same). Pennsylvania

30

regulations amplify that behavior support plans must use positive interventions. 22 Pa. Code § 14.133 ("Positive behavior support").

The PHP addressed behaviors. Ignoring the fact that G.L. was in the PHP is not the same as proving its failure. To say that the School District "did not provide G.L. with any behavioral support until after the [May/June 2014] IEP revisions," does not take into account that G.L. was placed in the PHP and does not provide a basis to reverse the hearing officer. The hearing officer properly exercised his discretion on the question of evidence, including the reliability of expert evidence. K.C. ex rel. her Parents v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 815-18 (E.D. Pa. 2011) (discussing discretion to weigh competing evidence); David G. v. Council Rock Sch. Dist., Civ. A. 06-1523, 2012 WL 1231812, *2 (E.D. Pa. Apr. 12, 2012) (discussing hearing officer review of evidence)

**F.    G.L.'s Placement.**

Plaintiffs seek an order that G.L. be placed at the Souderton Vantage Academy, contending that G.L.'s placement in his Therapeutic Emotional Support ("TES") classroom is inappropriate because problems with the TES are similar to problems with the PHP, specifically that there is a complete disconnect between the behaviors exhibited by G.L. and those acknowledged by the District.  Plaintiffs note the importance of following the recommendations contained in the J.J. Peters evaluation that G.L. should not be placed "in an emotional support classroom due to his negative experiences with 'students displaying excessive emotionality.'" Pls.' Mem. in Supp. at 11.  Plaintiffs offer that "[t]he comments and behavior of his peers in Emotional Support form a substantial trigger for those thoughts." Id. at 11-14.  Defendant counters that Plaintiffs' characterization of other TES students as "aggressive students," is

31

unsupported by evidence and public schools cannot label and segregate disabled students as good and bad based on "emotionality."

The Vantage Academy program offers a very small class size in a very small setting. At the time of the hearing, there were 41 students in the program and there would have been two students in G.L.'s classroom. (N.T. 304.) The size of the school can he contrasted to the Easton Middle School where the TES is located.  Easton Middle School has 1200 students. (N.T. 444.)  Vantage does not accept physically aggressive students. (N.T. 303.) The program involves the very intensive support of a counselor who is available to the student throughout the entire school day. (N.T. 305.) The program addresses therapeutic and emotional needs through the small setting and intensive counselor support available to the student. The program also addresses social skills and life issues. (N.T. 311.)  Behavioral support and cognitive behavior therapy are a part of the school's program. (N.T. 308-311.)  Staff at the school also have experience with children with psychosexual issues. (N.T. 312.)

Defendant argues that placement at Vantage Academy is not necessary for G.L. to have an appropriate educational program.  They note that a school cannot insulate G.L. from peer commentary. In fact, Lorraine Sulik, the administrator from Vantage Academy, testified that such banter cannot be eliminated, even at Vantage Academy. (N.T. 330.) The therapeutic emotional support program, however, monitors and modifies the behavior of all the students, and teaches G.L. effective coping skills that he will need in the larger real world.  (N.T. 415-416) (Mike Palos, describing redirect and discuss behavior).

The J.J. Peters report did not adversely opine about G.L.'s therapeutic emotional support classroom and instead stated that special education services "have been in place . . . to

provide an appropriate level of emotional support." (H.O. Decision, Ex. 3 at 15.) The report

states: "Due to [G.L.'s] negative past experiences with students displaying excessive

emotionality, it is recommended that [G.L.] not be in an emotional support classroom with

physically aggressive, hostile students. If this is not available in a public school, an approved

private school placement needs to be considered . . . ." This recommendation does not exclude

public school placement and is based upon S.H.'s report to the authors of "past experiences" with

"physically aggressive, hostile students." See H.O. Decision, Ex. 3 at 10 (S.H. reported "other

students made threats towards [G.L.], bullied him, and initiated physical altercations"). If G.L.'s

placement is not at a public school, the report calls for placement in an approved private school.

Defendant notes that Vantage Academy is not included in the 2016 listing of Pennsylvania

approved private schools. See http://www.education.pa.gov/Documents/K-

12/Special%20Education/APS%20Directory.pdf (listing 2016 Pennsylvania approved private

schools) (last accessed Mar. 30, 2017).

      Based on the record and the parties' competing motions for judgment, grounds do

not exist for reversing the hearing officer's Decision that did not specifically provide for G.L. to

attend Vantage Academy. Plaintiffs did not show that the School District is "factually incapable"

of implementing the proposed IEP in the TES placement.

### G.    Whether the Hearing Officer Properly Considered the J.J. Peters Comprehensive Biopsychosocial Evaluation-Psychosexual report.

      Plaintiffs contend that the Hearing Officer used selected portions of the evidence

and then disregarded "the big picture" because he found that G.L. was not a reliable reporter of

the facts. They contend that the dicta of the Hearing Officer is disturbing as he seems to accept

the critical need of G .L. for services and then fails to enter an order for the District to provide

those services.  According to Plaintiffs, this selective use of the J.J. Peters  report is error and is

dangerous because the result is a denial of critical services to a student in need.

Plaintiffs note that the J.J. Peters report notes G.L.'s difficulties with social

interaction but does not diminish the severity of G.L.'s needs by finding him to be an unreliable

reporter of facts or use that information to diminish the severity of his behavior. They contend

that it is entirely inconsistent for the Hearing Officer to adopt the recommendations of the report

and cite an urgency "to address the Student's educational needs as set forth in the psychosexual

evaluation as well as in the testimony of Student's current therapist in this matter" and then fail

to order the Defendant to implement these very recommendations.

Defendant responds that the Hearing Officer Decision refutes Plaintiffs'

contention that the hearing officer "fail[ed] to consider" the J.J. Peters report.  They note that the

hearing officer cites to the J.J. Peters report eight times throughout his findings of fact.  See

Richard S. v. Wissahickon Sch. Dist., 334 F. App'x 508, 511 (3rd Cir. 2009) (rejecting "ignored"

claim where ample evidence shows otherwise); J.L., 2010 WL 3947373 at *7 ("Parents present

an impressive amount of evidence regarding K.L.'s learning deficiencies which they claim were

not addressed by the District's program; that evidence does not have to be discounted or

invalidated to find that K.L. made progress under the IEP's nevertheless, received 'some

educational benefit' under the District's program, and to further find that neither Rowley nor the

IDEA require more than this.").  The Hearing Officer's Decision closes by describing the J.J.

Peters report as "sufficient cause to ensure that the District provide robust protective measures

against [sexual acting out]." (H.O. Decision at 17, n.8.) H.O. Culleton repeats this caution in the

concluding paragraph, urging the District to provide the services recommended in the report. <u>Id.</u> at 18.

A review of the Hearing Officer decision shows that he did not "selectively use" the J.J. Peters report or fail to enter an order for the District to provide the services recommended by the report. Rather, the decision shows that he seriously considered the report's findings and incorporated them in his Findings of Fact Nos. 64 through 67, as noted in his conclusion that "Hearing Officer intervention is not warranted, but in dicta I have urged the District to provide, on an emergent basis, the highly supportive education and related services that the Student needs, as evidenced by the recent psychosexual evaluation report and the testimony of Student's therapist in this matter." <u>Id.</u> at 18. The hearing officer's consideration of the J.J. Peters report is not rendered improper merely because the hearing officer did not make recommendations as Plaintiff opines he should have done. Accordingly, Plaintiff's argument fails.

**H.     Whether the Record as a Whole Supports the Hearing Officer's Decision and Order.**

The hearing officer concluded that some errors were committed by the District, but those errors did not amount to a failure to provide G.L. with a FAPE. (H.O. Decision at 18.) Plaintiffs contend that this Decision was erroneous because the District failed to offer an IEP reasonably calculated to provide meaningful educational benefit and failed to provide a placement which was appropriately specialized and intensive with respect to G.L.'s behavioral and emotional needs. Plaintiffs also contend that G.L. needs an educational placement where his emotional and mental health needs can be addressed during the entire school day. The Plaintiffs do not concede the Defendant's argument that the behaviors are not evident during the school

day. The Plaintiffs are not looking for the Defendant to "fix G.L." Rather, they seek an

appropriate educational placement that will address all of G.L.'s emotional and behavioral needs

throughout the school day.

Defendant does not question that G.L. has a history of extreme behavioral issues

and other needs, but contends that the most extreme behaviors occur outside the school setting

and G.L.'s social skills needs fall into social-perception and being able to understand self and

others in relational context, as shown by G.L.'s multiple hospitalizations at various times for

varying durations.  The public schools do not provide mental health treatment, let alone face

liability for failing to exorcise mental health demons. See Munir, 723 F.3d 423 (distinguishing

mental health needs and educational needs). Even education-based liability is not premised on

failed educational outcomes.  J.L., 2010 WL 3947373 at *5 ("To suggest that "failure to attain

IEP objectives equals an IDEA violation" is to set the bar on special education far too high. The

Rowley court acknowledged from the outset that "Congress expressly 'recognize[d] that in many

instances the process of providing special education and related services to handicapped children

is not guaranteed to produce any particular outcome.'") (citing Rowley, 458 U.S. at 192).

The hearing officer exhibited an insightful understanding of G.L.'s behaviors viz.

the school. "The Hearing Officer's weighing of the evidence was also entirely reasonable. The

Parents have not submitted evidence to this Court that addresses the evidentiary gaps identified

by the Hearing Officer." Lebron v. N. Penn Sch. Dist., 769 F. Supp. 2d 788, 798 (E.D. Pa. 2011).

The decision properly weighs the School District's conduct in response to in-school behaviors.

Defendant correctly notes that the public schools are not tasked with fixing family or individual

mental health pathologies. Plaintiffs have neither proven that there was a failure by the school or

36

that there was a failure of outcome in the services provided by the District to G.L. during the

relevant time period.  Accordingly, this claim is denied.

I.      **Whether the Record Contains Sufficient Evidence to Support the Hearing Officer's Conclusions that the District's Behavioral Services Were Appropriate and Sufficient to Meet G.L.'s Needs and that G.L. Made Meaningful Educational Progress.**

Plaintiff finally argues that the hearing officer's conclusions regarding the

programming provided to G.L. before and after his placement in the Partial Hospitalization

Program are also erroneous. The hearing officer stated the following:

> I conclude that the District provided Student with a FAPE during the relevant period ending on the last day of Student's fourth grade year.  Based upon what it knew as of April 30, 2013, the District reasonably bolstered its regular education services to address inappropriate behaviors, and its methods were successful for a time. During the bulk of the ensuing period of time, Student was placed in a highly structured, highly restrictive school-based partial hospitalization program, pursuant to a medical prescription. The record shows that this placement was appropriate for Student. While the District did commit procedural violations of the IDEA, Parent has not proven by a preponderance of the evidence that any of these violations produced a substantive denial of a FAPE.
> As noted above, the District'[s] actions with regard to Student during this period of time must be judged by what the District knew at the time. Student had exhibited both problematic and peculiar behaviors at a very early age. Some of these behaviors were disruptive in the school environment, and the District is charged with notice of these behaviors. Nevertheless, the District also was aware that its regular education teachers had established educational control and had proven able to educate Student while controlling Student's propensity to engage in inappropriate behaviors. Thus, it is not charged with notice that a change of educational placement was necessary in the beginning of the 2013-2014 school year.
> Therefore, when District personnel met with Parent in August 2013 to discuss two private evaluations that Parent had obtained over the summer of 2013, they had good reason to believe that Student's regular education teacher could bring Student's behaviors under educational control by utilizing behavior management techniques prescribed by the District's behavior specialist. Its behavior specialist joined the meeting with Parent, listened to Parent's concerns about Student, and devised an interim behavior management plan with the objective of extinguishing a cluster of behaviors that Student was likely to

37

demonstrate in the classroom, and that all participants believed would likely serve the function of escape from Student's educational program and its demands. The specialist trained the classroom teacher to implement this plan, and the record is preponderant that the teacher implemented it with sufficient fidelity to successfully modify Student's behavior and obtain Student's classroom participation and access to the curriculum. I conclude that the District's approach, based upon continuing Student's placement in regular education with specialized behavior supports, was reasonably calculated to provide Student with the opportunity to receive meaningful educational benefit.

At the same August meeting, the District began the process of obtaining a re-evaluation of Student for purposes of reviewing Student's need for special education under the IDEA, and in particular, to review Student's classification. The District received Parent's written permission to evaluate on September 4, 2013. Therefore, the District had until November 3, 2013 to complete its re-evaluation. During this period, Student remained in regular education, because Student's current classification was Speech or Language Impairment, which did not require a more restrictive setting. Based upon what the District knew, and based upon the apparent success of its interim behavior management plan, I conclude that it was not unreasonable for the District to defer any change of placement until after receiving a comprehensive re-evaluation.

. . . .

Parent argues that the District promised an FBA in August 2013 and did not deliver it until May 2014. I conclude to the contrary. The evidence establishes by a preponderance that the District's behavior specialist directed the special education teacher to keep some data, made his own observations on multiple occasions, and obtained other observations by other District staff.  The specialist gathered this and anecdotal reports by District staff, then developed an FBA, utilizing a system received from the Pennsylvania Department of Education. He conveyed the results to Parent on November 7, 2013. These results confirmed the successful behavior control strategy that had been implemented from the beginning of the school year.

This FBA became inoperative within days, when on November 14, Student entered the PHP. As noted above, circumstances had changed by October 21, and this FBA was no longer useful, due to the change in placement.

Parent suggests that the November 7 report to Parent either was not an FBA or was so inadequate as to deprive Student of a FAPE. Parent points to the lack of systematic behavior definitions and data-taking. While the process utilized was not as thorough and systematic as might be desired, it can still be called an FBA, and the District expert's opinion on this question is preponderant on this record. Moreover, there is no IDEA definition of FBA, nor is there a requirement for an FBA, or any particular kind of FBA, outside the discipline context under

the IDEA.

Parent notes that the District's January 2014 revision of the IEP did not acknowledge that Student's behaviors interfered with learning and that the revision did not include an FBA for the new placement at the PHP. I conclude that the IEP was procedurally deficient in this regard under Chapter 14 (requiring an FBA whenever behavior impedes learning). 22 Pa. Code § 124.133(a). There is no doubt that the negative effect of behavior should have been acknowledged at this point, with Student in a highly restrictive setting. However, I also conclude that the procedural violation did not cause a deprivation of a FAPE, because Parent participated in the IEP meeting, and because the PHP had a class-wide behavior management plan that proved over time to be sufficiently effective for Student that Student was able to receive meaningful - if not maximal - educational benefit.[fn6]

> fn6. Student's IEPs indicate that Student was delayed in reading ability, based upon reported grade level of achievement on standardized tests. The January IEP called for small group teaching and goals directed to improving Student's reading. On this evidence I do not find a deprivation of a FAPE with regard to reading. One IEP noted below-grade achievement in writing and spelling, but the record is insufficient to reach a finding on these areas of curriculum.

The PHP placement yielded slow but meaningful progress with regard to Student's escape behaviors and Student's classroom participation and access to the curriculum. Not only did the PHP's systematic behavioral evaluation show progress on a monthly basis starting in Spring 2014,[fn7] but also, Student made meaningful progress in reading comprehension during the period of time. Therefore, I conclude that Parent has failed to prove by a preponderance of the evidence that the Student did not receive a FAPE during this period.

> fn7. Evidence showed that Student escaped from the PHP building about a month before discharge; staff restrained Student but did not report this as required by Pennsylvania regulations. While this impeded Parent's participation by definition, it did not prevent Parent from such access as to lead to any major decisions being made without her. While this represented a behavioral setback, there is no evidence that it delayed discharge or otherwise deprived Student of meaningful educational benefit.

The PHP placement extended into the next school year, and I find no evidence to disturb the above conclusions for the period from the beginning of fifth grade until Student's discharge from the PHP in November 2014.

PROVISION OF A FAPE IN STUDENT'S FIFTH GRADE YEAR

As noted above, the evidence shows that Student was not deprived of a FAPE while in the PHP in the first months of fifth grade. In November 2014, Student had made sufficient progress that the PHP discharged Student to a less restrictive setting, a full-time therapeutic emotional support classroom in a public middle school (TES).

While in the TES program in the middle school, Student continued to report serious emotional issues to Parent and to Student's therapist. However, many of Student's claims about events at school were contradicted by the absence of any evidence of them happening at school.[fn8]  The Student's teacher and the program supervisor both consistently and credibly reported that Student did not experience significant difficulties with emotional regulation, unhappiness, social relationships or school performance. Student did not report Student's sexual thoughts to school staff to a significant extent. Student did not make significant threats of self harm or intention to harm others, and did not engage in skin-picking or self harm behaviors.

> [fn8] I make no finding as to whether or not Student engaged in behavior designed to provide the opportunity for sexual acting out, such as making excessive trips to the bathroom. The psychosexual risk assessment recently obtained is sufficient cause to ensure that the District provide robust protective measures against such activity.

I conclude that the evidence is not preponderant that the TES program failed to provide Student with a FAPE. The evidence is contradictory. On one hand, Student reported serious difficulties at school to Student's Parent and therapist; however, the school witnesses credibly testified that Student was doing well there and experiencing none of the extreme difficulties that the Student had reported to Parent. The record is replete with credible testimony, parental admissions during medical history interviews, and examples of the fact that Student is not a reliable reporter of facts.

Therefore, although I find Parent to be credible, her reports as to Student's serious problems at school are almost entirely based upon Student's reports. Nor did Student's current therapist, whose testimony was entirely credible, base his conclusions upon any evidence from collateral sources such as school personnel; his opinions were based entirely upon parental reports and those of the Student. Weighing the testimony, then, I conclude that Student's unreliable reports, the basis for much of Parent's testimony about the District's implementation of Student's program and the benefit that Student received from it, must be given less weight than the consistent and credible reports of Student's teachers in the TES program. Consequently, Parent's factual claims about this program, to the

extent that they indicate a failure to provide a FAPE, must fail.

(H.O. Decision, pp. 11-13, 16-18.)  Plaintiffs argue that at each of the three phases to this case,

pre-PHP at the elementary school, the PHP, and post-PHP at the therapeutic emotional support

("TES") placement, G.L. did not receive a FAPE.

            Pre-PHP, Plaintiffs challenge the FBA carried out during Fall 2013, claiming that

hearing officer "findings regarding the efforts of the Behavior Specialist ... [a] were not

supported on the record and [b] the credibility of which were brought into question by the

testimony of Mother." Pls.' Mem. in Supp. at 16.  Regarding Plaintiffs' statement that "[v]arious

behaviors were not noted in the notes taken by the Behavior Specialist,"  (Id. at 17), Russ

Carawan, the Behavior Specialist did not recommend a PBSP because he did not observe any

interfering behaviors.  (N.T. 204, 222, 248, 249-250.)  G.L.'s elopement to S.H.'s classroom

occurred prior to Carawan's observation of G.L., therefore such behaviors would not be

contained in his data or reports.  (N.T. 203-204 (Carawan); N.T. 375-376 (Carol Tavormina,

describing single time G.L. left her classroom on second day of school); N.T. 376 (Tavormina,

stating only one elopement from classroom)).  Plaintiffs also contend that absent in Carawan's

data was "G.L.'s skin picking behavior."  Pls.' Mem. in Supp. at 17. This behavior was not

identified as a target behavior and because no other source than S.H. reported that G.L. was

picking his skin, it is a logical conclusion that G.L. was not observed exhibiting such behavior in

school.  (N.T.  232-233, 237-238 (Carawan); N.T. 380 (Carol Tavormina)).  Regarding the "melt

down at an IEP for [G.L.'s] brother," Pls.' Mem. in Supp. at 17, this behavior did not occur

during any instructional activity or an FBA-related observation.  (N.T. 223-224 (Russ Carawan,

describing incident)).  As Plaintiffs acknowledge, the behavior specialist clearly knew about the

event, having been drawn into the meeting in order to assist with G.L.'s outburst, but this meltdown was not school-related, but rather "was caused by Student's proximity to Student's father, mother and sibling at the meeting, which triggered deep-seated family pathology, directly causing behavioral dyscontrol," therefore the hearing officer's conclusion that "the evidence is not preponderant that the Student's educational program had caused this recurrence of symptoms" is not erroneous.  (H.O. Decision at 14; N.T. 223-224, 226 (Russ Carawan, describing incident)).

Plaintiffs contend that the failure of the District to record relevant behavioral information continued at the PHP and the TES placements. Both of these placements based any data collection on generic class wide systems. Plaintiffs contend that G.L.'s behaviors were not sufficiently identified to allow for appropriate individualization in his IEPs. As a result, behavior sheets came home indicated 100% compliance at school on days that G.L. was reporting hearing voices. (N.T. 138 (S.H.).) G.L.'s obsession with sexual thoughts was brought to the attention of S.H. by staff at the PHP but this was not recorded in the documents. (N.T. 141-142.) In the Treatment Plans (S-30), behaviors were noted that were not otherwise recorded or reflected in the IEP. For example, on January 9, 2014 it was noted that G.L. was using vomiting as a means to escape the classroom.  Yet, the TALID scores reflect 95-97% compliance. (S-30, p. 6.) Visual and auditory hallucinations were reported as a means of avoidance. (S-30, p. 8.) Even when discussing discharge from the PHP program, concerns about G.L.'s behavior were noted in manipulation and continued concern about sexual obsessions. This is the same time frame in which the program's own psychiatrist recommended a psychosexual assessment and constant monitoring of G.L. During this time frame, G.L. also eloped twice from the PHP summer

program. (N.T. 152.)  In October of 2014, prior to discharge from the PHP, a restraint took place

that was not reported to the mother. (H.O. Finding No. 41.) Plaintiffs submit that there are

enough inconsistencies in the documentation in this case to warrant finding against the credibility

of the documents submitted by the District.

        Defendant notes that as to the PHP, Plaintiffs again assert an IEP content-based

challenge although the specific concerns were, in fact, addressed as part of the treatment plan..

Pls.' Mem. in Supp. at 17 ("In the Treatment Plans (S-30) behaviors were noted that were not

otherwise recorded or reflected in the IEP.") Defendant contends that these are not

"inconsistencies" that undermine the credibility of the documents but are actually consistencies

in provision of treatment reporting and the fact that specific events were noted in monthly reports

and reviewed monthly with S.H. but are not reported in the IEP does not undermine the supports

and services and the effectiveness of G.L.'s treatment while in the PHP.

        After the PHP, Plaintiffs similarly argue that "gaps in record keeping render the

information provided by the district completely unreliable." Pls.' Mem. in Supp. at 18-19.

Defendant argues that the "gaps" involve either G.L.-sourced reports or various events that are

not related to the IEP goals.  Plaintiffs do not identify a requirement to collect data on G.L. being

upset, G.L. needing to speak to a teacher, or G.L.'s perseveration. Plaintiffs' argument returns to

S.H.'s testimony that is, in turn, based on G.L.'s reports, i.e., that the therapeutic emotional

support class must be inappropriate because "behavior sheets came home indicated 100%

compliance at school on days that G.L. was reporting hearing voices," Pls.' Mem. in Supp. at 17

(citing N.T. 138 (S.H.)), and the idea that the teacher cannot consider the contexts of student

remarks.  Pls.' Mem. in Supp. 19 ("[Palos] dismisses a threat that was made to G.L. as something

that would never happen."  (citing N.T. 441 (Palos)).

Putting aside that not noting these things was appropriate, and putting aside that witnesses responded credibly to these contentions, Plaintiffs do not explain how the failure to note these things deprived G.L. of a FAPE. Ultimately, Plaintiffs' arguments are their disagreement with the hearing officer's view of the evidence. They offer, in essence, that the evidence was not good enough to prove a FAPE.  This Court finds that Plaintiffs have not shown reason to depart from the hearing officer's treatment of the facts.

## IV.    CONCLUSION.

This Court finds, by a preponderance of the evidence while also giving due weight to the factual findings of the hearing officer, that the record supports the conclusion that Plaintiffs have not established that G.L. has been denied FAPE by the Defendant and that he requires a highly specialized placement to meet his emotional and behavioral needs. See Nicholas H., 2017 WL 569519, at *3 (citing Mary T., 575 F.3d at 241 (quotation omitted)). Accordingly, Defendant's Motion will be granted and Plaintiffs' Motion will be denied. Judgment will be entered for the Defendant and against the Plaintiffs.

An appropriate Order follows.